## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| DENNIS HAIRSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: LKG-24-3420 |
| v. | ) | |
| | ) | Dated: February 11, 2026 |
| WARDEN THOMAS WOLF, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM

Self-represented Plaintiff Dennis Hairston brings this civil rights action against Warden Thomas Wolfe, Assistant Warden Emmanuel Nzeadighibe, Chief of Security Curtis Henson, Captain Nina Rizer, Dr. Desha Bedford, Captain James Davis, Captain Keairra Spencer, Captain Robert Smead, Lieutenant Yolanda Downing, Lieutenant Kolawole Salami, Sergeant Joseph Baah, Sergeant Lawrence Ekwutife, Officer Seth Frimpong, Dr. Handles, Officer Alesha Fitzgerald, and Officer Aricka Mosby.[1] ECF No. 7. Hairston claims Defendants were deliberately indifferent to and failed to protect him from secondhand K2 smoke at Chesapeake Detention Facility ("CDF") and he did not receive adequate medical care after he was exposed.

On July 10, 2025, a Motion for Summary Judgment was filed on behalf of Dr. Bedford for the time she was an employee for YesCare Corp. ("YesCare"). ECF No. 33. Hairston opposed the Motion. ECF No. 41. Dr. Bedford replied. ECF No. 44. On November 10, 2025, a Motion to Dismiss or, Alternatively, for Summary Judgment was filed on Dr. Bedford's behalf for the time she was an employee for Centurion. ECF No. 53. Hairston opposes the motion.[2] ECF No. 57.

On September 2, 2025, Defendants Davis, Downing, Ekwutife, Fitzgerald, Frimpong, Henson, Mosby, Nzeadighibe, Salami, Smead, Spencer, and Wolfe ("State Defendants") filed a Motion to Dismiss. ECF No. 42. Hairston opposes the Motion. ECF No. 49. Counsel for State

---

[1] The Clerk shall be directed to amend the docket to reflect Defendants' full names and titles.

[2] Hairston filed a Motion to Excuse the Delay in Filing Reply (ECF No. 58), requesting that the Court accept his late response to the supplemental motion. The motion will be granted.

Defendants also filed a Motion to Dismiss for Defendant Rizer on October 8, 2025, which will be considered with the State Defendants' Motion. ECF No. 51. Hairston filed a separate opposition to Rizer's Motion. ECF No. 56. All pending motions are ripe for review, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2025). For the foregoing reasons, Dr. Bedford's Motions will be granted, and State Defendants' Motions will be granted in part and denied in part.

## I.      BACKGROUND

### a.  Amended Complaint Allegations

Hairston was transferred to CDF on February 5, 2024. ECF No. 7 at 8. He states that he inhaled K2 smoke every day for seven months, through August 26, 2024. *Id.* According to Hairston, K2 is a mixture of "car care liquids, beauty supplies, household products, rodent control items, soil pesticides, post mortem chemicals & popular street level opiods [sic]: anti-freeze, starter fluid, hair spray, eye drops, bleach, lysol, oven cleaner, paint thinner, pool cleaners, rat poison, boric acid, bug spray, tree fertilizer, phencyclidine (PCP), bath salts crystal meth and fentanyl." *Id.* at 8-9. He alleges that the CDF staff allowed inmates to smoke K2 "on the tiny units" which were in close proximity to Hairston's cell. *Id.* at 9. He suffers from asthma, depression, and anxiety, which means secondhand smoke and toxic, mind altering substances pose a severe risk to his health. *Id.* Due to the exposure, he has experienced asthma attacks, hallucinations, loss of sensation in his genitals, insomnia, migraines, loss of appetite, weight loss, sinus infections, nausea, vomiting, poor eyesight, lock jaw, and "mutated speech." *Id.* at 9, 18.

Hairston states that he informed staff in March 2024 that the K2 smoke was a risk to his health due to his asthma. ECF No. 7 at 10. He spoke to Warden Wolfe, Chief of Security Henson, Captain Rizer, Captain Davis, Lt. Salami, Sgt. Baah, and Officer Frimpong. *Id.* When nothing was done to resolve the matter, he wrote a letter to Wolfe, Nzeadighibe, Henson, Davis, Downing, and Salami on or about April 10, 2024, informing them of the "K2 epidemic" and urging them to enforce the non-smoking policy. *Id.* Still, nothing was done. On or about May 10, 2024, Lt. Downing called Hairston in to discuss the smoking policy at which she threatened to move him to the "lock up housing unit" if he ever complained again about drugs being used at CDF. *Id.* at 12-13.

2

At about the same time he wrote his letter, Hairston submitted a sick call slip complaining about the ongoing exposure. ECF No. 7 at 10-11. He reported daily asthma attacks and difficulty breathing. *Id.* at 11. Hairston saw Dr. Bedford the following week. Her advice to Hairston was "Everyone here smokes, what do you want me to do, I could but I'm not reccomending [sic] that the Marshals transfer you although it's causing you health problems, I'm sorry but your [sic] just going to have to tough it out while your [sic] here and deal with it as best as you can." *Id.*

Hairston filed multiple sick calls each month, but he was not examined. ECF No. 7 at 11. In June 2024, Dr. Bedford, who decides which inmates are seen, told him on another occasion that she could not help Hairston with the smoke issue and ignored the symptoms described in his many sick calls. *Id.* at 11-12. His physical symptoms were ignored, and Hairston was instructed to contact psychology about his insomnia and hallucinations. *Id.* at 12. After being seen by mental health staff, he was referred to Dr. Handles for evaluation. *Id.* Hairston asserts that he was not evaluated and no changes in his psychiatric medication were made. *Id.*

As early as April 14, 2024, Hairston began to file grievances about the correctional staff permitting the use of K2 at CDF. ECF No. 7 at 13. He alleges that several of his grievances were lost but those that were reviewed were denied by Wolfe and Nzeadighibe. *Id.* Both ignored his allegations about the smuggling, sale, and consumption of K2. At most, Nzeadighibe acted appalled but still took no corrective action. *Id.* Hairston states that Chief of Security Henson was also aware of the problem because multiple times in the summer of 2024, he arrived at Housing Unit D for medical emergencies caused by K2 usage. *Id.* at 14. Hairston also asserts that Captain Rizer, who is responsible for investigating criminal activity within CDF, failed to perform tier shake downs, mass urinalysis, or observe the detainee's drug transactions. *Id.*

Hairston alleges that both Captains Davis and Spencer were in charge of the daily operations of Housing Unit D during 2024. ECF No. 7 at 15. He states that Davis and Spencer were aware of the K2 usage because they were in the unit every day smelling the smoke and witnessing detainees' smoking. *Id.* Neither took any action, nor did Lt. Downing, who was frequently present while she supervised the housing unit, or Lt. Salami, who told Hairston that it would be "handled." *Id.* at 16. On one occasion Hairston was interviewed by Captains Smead and Rizer about one of his K2-related grievances. *Id.* at 15. Smead acknowledged that Hairston should not be subjected to those conditions but only told Hairston, "you've been locked up

before you know how it is what can we do." *Id.* As to Sgt. Baah, Lt. Ekwutife, Officer Fitzgerald, and Officer Mosby, Hairston also asserts that they were aware of K2 being smoked and did nothing to prevent it. *Id.* at 16-18. Hairston further alleges that, in response to one of his grievances, Officer Frimpong smelled smoke and witnessed intoxicated and smoking inmates during a follow up investigation. *Id.* at 17. Frimpong even encourages inmates to do so. *Id.*

### b. Dr. Bedford's Declaration

Dr. Bedford attests that secondhand smoke from K2, a synthetic marijuana, can cause hallucinations, paranoia, psychosis, agitation, confusion, anxiety, increased heart rate, and elevated blood pressure. ECF No. 33-2 at ¶ 5. Dr. Bedford denies that Hairston ever presented to medical with any of these symptoms or that she ever observed him experiencing these symptoms. *Id.* She states there is no record of Hairston having an asthma attack which typically requires medical intervention. *Id.* Hairston is prescribed an albuterol inhaler but that is only preventative and would not stop an asthma attack once it started. *Id.* Dr. Bedford denies having authority to transfer Hairston to another facility and avers that she does not oversee sick call scheduling. *Id.* at ¶ 7, 8. As such, she either did not have authority or control over the requests made by Hairston. *Id.*

Bedford explains that a Heat Stratification system determines where inmates can be housed because some facilities do not have air conditioning. ECF No. 33-2 at ¶ 6. Inmates with severe asthma, chronic obstructive pulmonary disease, pulmonary hypertension, or similar breathing issues are classified as H1 and are moved to air-conditioned housing in the summer if it is available. Dr. Bedford attests that Hairston's asthma was not severe because he has an H2 classification and would only be moved if there was still availability after all H1 inmates have been moved. *Id.*; ECF No. 33-4 at 31.

### c. Hairston's Medical Records

Hairston arrived at CDF from the North East Ohio Correctional Center on February 5, 2024; he was listed as having allergic rhinitis, asthma, and major depressive disorder. ECF No. 33-6 at 14. Hairston was cleared for housing in general population after a behavioral health suicide risk evaluation. ECF No. 33-5 at 19-20. He was also referred to psychiatry for evaluation and medication because he reported that he was taking Zoloft and Vistaril for anxiety and depression. *Id.*

4

The following day PA Susann Galloway conducted Hairston's intake physical exam during which he reported having asthma since childhood as well as chronic pain following an ankle injury. ECF No. 33-5 at 13-14. Galloway ordered labs, referred him to chronic care, ordered Hairston an inhaler, and prescribed muscle rub and Zyrtec. *Id.* at 11, 16-17. She also gave him an indefinite bottom bunk pass. ECF No. 33-6 at 1. On February 7, 2024, NP Digna Cespedes-Cloud completed Hairston's initial psychiatric evaluation and prescribed the same medications he was already taking for anxiety and depression. ECF No. 33-5 at 4-8.

In response to a sick call request, DNP Ifeyinwa Ibeanu saw Hairston on April 10, 2024, to renew his albuterol inhaler and Zyrtec prescriptions. ECF No. 33-4 at 25-27; *see also* ECF No. 33-7 at 19. He reported that his last asthma attack was in February 2024. ECF No. 33-4 at 25. However, the following day, Hairston submitted another sick call asserting that since his arrival at CDF he had been experiencing frequent asthma attacks, dizziness, and chest, throat, and lung pain due to exposure to K2. ECF No. 33-7 at 17-18. He requested daily nebulizer treatments to address his symptoms. *Id.* at 18. Dr. Bedford attests that this was the first time Hairston complained about smoke inhalation to the medical staff. ECF No. 33-2 at ¶ 17.

Hairston saw Dr. Bedford in response to a sick call on April 23, 2024, reporting that he was having to use his inhaler more often and wanted to be moved to a tier without smoke. ECF No. 33-4 at 19-21. Hairston presented with an itchy throat and shortness of breath. *Id.*; ECF No. 33-2 at ¶ 18. Assessing that he was likely exposed to environmental tobacco smoke, Dr. Bedford instructed Hairston to continue using his inhaler and to return if it was not effective. ECF No. 33-4 at 20. Dr. Bedford avers that his symptoms were "typical of allergic rhinitis and mild asthma" and were not necessarily from exposure to secondhand smoke. ECF No. 33-2 at ¶ 18.

Following his conviction in approximately late May or early June, Hairston was referred for a wellness assessment by the federal liaison; he saw LCPC Marie Simmons on June 7, 2024. ECF No. 33-4 at 10-13. Hairston reported doing well on his psychiatry medication and denied having any safety or security concerns in his housing unit. *Id.* at 10-11. A follow up appointment was scheduled for June 20, 2024, at which time Hairston told NP Cespedes-Cloud that he was "okay" and denied depression symptoms but appeared mildly anxious about his upcoming court date. *Id.* at 3-5. His psychiatric medications continued at the same dosages, and Hairston was educated on heat management during hot weather. *Id.*

On July 1, 2024, Hairston saw Dr. Bedford again to address his sick call complaining of daily chest pain, but he reported during the appointment that his symptoms had been resolved by an inhaler the previous night. ECF No. 33-7 at 11; ECF No. 33-3 at 34. His vital signs were normal, and he did not have shortness of breath. ECF No. 33-3 at 35. Dr. Bedford renewed Hairston's inhaler but did not observe any indicator that he was being affected by secondhand smoke. ECF No. 33-4 at 1; ECF No. 33-2 at ¶ 25.

Hairston wrote a sick call request on July 7, 2024, claiming he was experiencing memory loss, hallucination, and panic attacks. ECF No. 33-7 at 10. He saw LGPC Ebony Holmes the following day. ECF No. 33-3 at 25-28. He reported having experienced auditory and visual hallucinations for several months. *Id.* at 25. Hairston asserted that the hallucinations were triggered by the smell of drugs being smoked near his cell. *Id.* He denied suicidal or homicidal ideations and explained that he "just hear[s] weird noises not voices telling to do bad things." *Id.* LGPC Holmes did not find Hairston to be in immediate distress. *Id.* Dr. Bedford saw Hairston the same day for "reevaluation of informal complaint;" she noted that his complaints had been addressed on July 1, 2024, and he did not have any other problems. *Id.* at 29-30.

On July 14, 2024, Hairston filed ten sick call requests complaining of muscle spasms, rapid heartbeat, shaking, migraines, cold sweats, stomach pains, constipation, diarrhea, nausea, indigestion, vomiting, joint stiffness, fatigue, vision loss, acid reflux, loss of appetite, erectile dysfunction, and coughing up "black gooey stuff" with blood. ECF No. 33-6 at 35; ECF No. 33-7 at 1-9. Each submission states that he had previously complained about the issues which Dr. Bedford attests is false. *Id.*; ECF No. 33-2 at ¶ 28.

Dr. Bedford saw Hairston on July 16, 2024, to address the ten sick calls. ECF No. 33-3 at 19-22. He was alert, oriented, unlabored and even beating, and stable vitals. *Id.* at 21. Dr. Bedford avers that Hairston did not cough during the exam, and she did not observe any evidence that he had coughed up blood. ECF No. 33-2 at ¶ 29. Hairston attributed his nausea to certain food like hot dogs; Dr. Bedford notes that he previously reported an allergy to processed meats. ECF No. 33-3 at 19; ECF No. 33-5 at 13. Dr. Bedford submitted a consultation request to have an optometrist evaluate Hairston for glasses. ECF No. 33-3 at 17-19. Dr. Bedford avers that after a physical examination she could not substantiate any of his other complaints. ECF No. 33-2 at ¶ 29. She ordered a chest x-ray to further investigate Hairston's chronic cough. ECF No. 33-3 at 23-24.

6

On July 18, 2024, Hairston filed a sick call seeking to speak to psychiatry about insomnia and erectile dysfunction. ECF No. 33-6 at 34. He saw Dr. Sharon Handel that day but reported that he was feeling stable and had no issues with sleep. ECF No. 33-3 at 15-16. LCPC Simmons saw Hairston again about that sick call on July 23, 2024. *Id.* at 11-14. His main complaint was not his insomnia but rather that detainees were smoking in his housing unit; Hairston claimed his body was breaking down, he had difficulty breathing, and was experiencing blackouts and chest tightening. *Id.* at 11. He also reported that he had an asthma attack the prior weekend; Dr. Bedford contends that there is no record of Hairston going to medical for such an attack. *Id.*; ECF No. 33-2 at ¶ 32. In response to Hairston's concerns about his anxiety and request for an increase to his dosage, Simmons referred him to psychiatry for a medication review. ECF No. 33-3 at 11. Hairston returned to Dr. Handel on July 30, 2024, and again, instead of raising the issues he previously reported, he denied any symptoms of depression, anxiety, or insomnia. *Id.* at 9. As such, Dr. Handel maintained his Zoloft prescription at the same dosage. *Id.* at 10.

Dr. Bedford received and reviewed Hairston's chest x-ray, which was negative, on August 2, 2024. ECF No. 33-3 at 8. Hairston was transferred out of CDF on August 26, 2024, before his scheduled follow-up appointment. *Id.*; *see* ECF No. 33-5 at 33. Hairston saw LCPC Simmons on August 23, 2024, prior to his transfer, to discuss a protective custody denial form. ECF No. 33-3 at 5. Simmons noted that after Hairston had talked to Captain Rizer, Hairston was offered to be moved to a different housing location in response to his informal complaints about how other inmates' smoking was affecting his health. *Id.* Hairston declined to be moved asserting that the problem was in every housing unit. *Id.* At the time, Hairston was not in any acute distress but reported being frustrated because he did not feel either medical or correctional staff were taking his health concerns seriously. *Id.*

## II.   STANDARDS OF REVIEW

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility

7

that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)). The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the Court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the Court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a pro se complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, at 637 (4th Cir. 2016) (quoting *King v. Rubenstein*, 825 F.3d 206, 212, 214 (4th Cir. 2016) (quoting *Twombly*, 550 U.S. at 570)).

The Court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The Court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not

8

disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015); Fed. R. Evid. 201(b). When the parties present and the Court considers matters outside the pleadings on a Rule 12(b)(6) motion, the Court must treat the motion as one for summary judgment under Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

The Court notified Hairston that he had the right to respond to Dr. Bedford's second motion (ECF No. 53), that the motion could be construed as a motion for summary judgment, and that if he did not file a timely and adequate response, the Court could rule in Dr. Bedford's favor. ECF No. 54. Moreover, this motion, which identifies summary judgment as possible relief, provided sufficient notice for Hairston to have a reasonable opportunity to present relevant evidence in support of his position. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). Hairston opposed the motion. ECF No. 57. Thus, the Court is satisfied that Hairston has been advised that the motion could be treated as motions for summary judgment and that he has been given a reasonable opportunity to present materials in response to the motion. The Court will resolve the motion under Rule 56 if appropriate.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

9

(1986). In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

## III.   Discussion

### a.   Dr. Bedford's Motions

Dr. Bedford asserts that, in regard to the time she was employed by YesCare, she is entitled to summary judgment in her favor because Hairston did not have an objectively serious medical need and she did not fail to act appropriately in response to his condition. ECF No. 33-1. As to the time she was employed by Centurion, Dr. Bedford asserts that Hairston's Amended Complaint fails to state an Eighth Amendment claim against her or, alternatively, she is entitled to qualified immunity. ECF No. 53-2.

At the times relevant to the case, Hairston was a pretrial detainee at CDF until his conviction in approximately May or June 2024. Therefore, the Court will review the claims against Dr. Bedford under both the Eighth and Fourteenth Amendments. For convicted prisoners, the Eighth Amendment's prohibition on cruel and unusual punishment protects them from "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (citations omitted). In order to state an Eighth Amendment claim arising from inadequate medical care, a prisoner must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The Due Process Clause of the Fourteenth Amendment protects the rights of pretrial detainees to receive adequate medical care. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating that "the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care" to pretrial detainees "who require it") (citation omitted)). The Fourteenth Amendment "protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" *Short v. Hartman*, 87 F.4th 593, 608-09 (4th Cir. 2023) quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). "To state a claim of deliberate indifference to a medical need . . . a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally,

knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed." *Short*, 87 F.4th at 611. This means that a pretrial detainee "no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Id*.

Dr. Bedford argues that Hairston's asthma and allergic rhinitis did not present a medical condition that posed a substantial risk of harm. ECF No. 33-1 at 17. Dr. Bedford asserts that Hairston did not have an asthma attack at CDF, his asthma was controlled by an inhaler, his heat stratification classification was H2, he never required intubation or hospitalization for asthma, and he never declared he was having a medical emergency or return to medical with shortness of breath. *Id.* at 17-18.

The Court agrees that there is no record of Hairston having an asthma attack that caused him physical harm requiring the medical staff's intervention. The evidence presented also shows that Hairston often contradicted himself regarding his symptoms. He claims that his breathing issues began immediately upon arriving at CDF but also waited two months to report his symptoms to the medical staff. Hairston also claimed that his symptoms were constant but then reported that he had not had an asthma attack for two months. Significantly, after requesting to be moved to a different tier, he declined to be moved to another housing unit when it was offered months later.

Hairston's other symptoms also did not present objectively serious medical needs. His reports of shortness of breath and chest tightening, which could possibly satisfy the requirement, were either isolated or had resolved by the time Hairston saw a provider. Similarly, Hairston's self-reported chronic cough was not substantiated by Dr. Bedford's examination. She notably sent out for a chest x-ray anyway. Hairston's complaints regarding his mental health were also inconsistent. He asserted that he was hallucinating but then when he was referred to a provider he denied these symptoms. The mental health providers never observed Hairston in acute distress and received inconsistent reports about his anxiety and depression. Having failed to establish that he had an objectively serious medical need, both Hairston's Eighth and Fourteenth

11

Amendment claims against Dr. Bedford must fail. Both of her motions for summary judgment will be granted.

### b. State Defendants' Motion to Dismiss

State Defendants (including Defendant Rizer)[3] argue that they are entitled to dismissal of the Amended Complaint because Hairston has failed to demonstrate a deprivation of his constitutional rights, nor does he allege a cognizable claim against State Defendants. ECF No. 42-1 at 2.

As a preliminary matter, State Defendants assert they are immune from suit in their official capacities. The Court agrees. Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent or congressional action. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Accordingly, to the extent Hairston sued State Defendants in their official capacities, those claims will be dismissed. The Court turns to the claims against them in their individual capacities.

In his Amended Complaint, Hairston states that he brings claims for deliberate indifference and failure to protect from harm. Hairston's deliberate indifference claim is best construed as a challenge to his conditions of confinement. State Defendants seem to construe it as a claim for denial of medical care, but Hairston very specifically only raised medical claims against the two defendant doctors. Regardless, because Hairston was a pretrial detainee at CDF, both of his claims are governed by the Fourteenth Amendment.

In each instance, to state a claim under the Fourteenth Amendment, a pretrial detainee first must allege an objectively "serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). This inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates

---

[3] Rizer's Motion to Dismiss incorporates all of the arguments raised in the State Defendants' initial Motion to Dismiss. ECF No. 51 at 1.

contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Then, as for any Fourteenth Amendment claim, the plaintiff must allege that the injury or risk of injury resulted from the defendant's action or inaction, and that "the 'governmental action' they challenge" is not 'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'" *Short*, 87 F.4th at 611 (4th Cir. 2023) (quoting *Kingsley*, 576 U.S. at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)) (internal quotation marks omitted). A pretrial detainee can state a Fourteenth Amendment claim "on [a] purely objective basis" because "*Kingsley*'s objective test extends to all pretrial detainee claims under the Fourteenth Amendment … for deliberate indifference to an excessive risk of harm." *Id.* at 610–11.

State Defendants claim that Hairston's allegations are too vague to establish that there was an unjustifiably high risk of harm to him. ECF No. 42-1 at 12. According to the State Defendants, Hairston has not pleaded any causal link between his inhalation of K2 smoke and his medical conditions and that both his verbal and formal complaints to State Defendants are insufficient because he did not name any specific inmate who was a threat to his health. *Id.* Additionally, they argue that Hairston's allegations regarding the usage of K2 throughout the entirety of CDF are purely speculative because Hairston states that he was only housed on the D tier of Pod 3. *Id.*

The Court disagrees with State Defendants' interpretation of the allegations in Hairston's Amended Complaint. Hairston very clearly states that the harm to him is the K2 smoke. He does not claim that any specific inmates are responsible, he claims that State Defendants failed to protect him from the alleged environmental hazard, secondhand smoke. Hairston also quite expressly states that K2 is a mind-altering drug which poses a significant risk to him as someone with anxiety and depression. Moreover, Hairston alleges how and why each State Defendant was aware of the conditions on his tier and the way they failed to respond to the issue. Hairston's claims that State Defendants failed to take any corrective action in light of his being intoxicated against his will and put at further risk due to his health conditions is sufficient to meet the objective standard for deliberate indifference. The State Defendants' Motion will be denied as to the claims against them in their individual capacities.

13

## IV.     Remaining Unserved Defendants

To date, Defendants Dr. Handles and Sgt. Baah have not been served with the Amended Complaint after multiple attempts by the Court. The Office of the Attorney General provided the Court with Sgt. Baah's last known address, but the summons issued and served by mail was returned unexecuted. ECF No. 55. The Court will direct the Marshal to attempt personal service on Sgt. Baah at the address previously provided (ECF No. 39).

From review of the medical records provided, it appears Defendant Handles is Dr. Sharon Handel. The Court has reviewed Hairston's allegations against Dr. Handel pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and § 1915A(b)(1), and finds that the Amended Complaint against her is subject to dismissal for failure to state a claim. Hairston's allegations state that he was referred to Dr. Handel for evaluation, but he was not evaluated nor were any changes made to his psychiatric medications. ECF No. 7 at 12. Hairston does not allege any misconduct by Dr. Handel; he does not attribute the lack of examination or the continuity of his medications to her actions. Without more, this is a conclusory allegation of harm which must be dismissed.

## V.     CONCLUSION

For the foregoing reasons, Dr. Bedford's Motions (ECF Nos. 33 and 53) will be granted and summary judgment entered in her favor. The State Defendants and Rizer's Motions to Dismiss (ECF Nos. 42, 51) will be granted as to the official capacity claims and otherwise will be denied. The Amended Complaint will be dismissed as to the claim against Dr. Handel. State Defendants shall file an Answer to the Amended Complaint within 30 days and any dispositive motion within 60 days.

A separate Order follows.

2-12-2026
Date

LYDIA K. GRIGGSBY
United States District Judge

14